AUSA:     Alyse Wu                          Telephone: (313) 226-9589
AO 91 (Rev. 11/11)  Criminal Complaint      Special Agent:     Shanika Sanders        Telephone:  (313) 226-2573

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Michigan

United States of America
    v.

Mykia King

Case: 2:21−mj−30178
Assigned To : Unassigned
Assign. Date : 4/14/2021
CMP: SEALED MATTER (MAW)

### CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____July 2020 through the present_____ in the county of _____Wayne_____ in the
_____Eastern_____ District of _____Michigan_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1343 | Wire Fraud |
| 18 U.S.C. 1341 | Mail Fraud |
| 18 U.S.C. 1349 | Conspiracy to Commit Wire and Mail Fraud |

This criminal complaint is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

_Shanika R Sanders_
_Complainant's signature_

Special Agent Shanika Sanders
_Printed name and title_

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date: _____April 14, 2021_____

City and state:  _Detroit, MI_

_Elizabeth A. Stafford_
_Judge's signature_

Elizabeth A. Stafford, U.S. Magistrate Judge
_Printed name and title_

## <u>Affidavit in Support of an Application for an Arrest Warrant</u>

I, Shanika Sanders, being first duly sworn, hereby depose and state as follows:

## <u>Introduction and Agent Background</u>

1.      I am a Special Agent (SA) of the U.S. Department of Labor, Office of
Inspector General (DOL/OIG), and have been so employed since January 2016.
Prior to this assignment, I was employed as an investigator in Industry Operations
for the Bureau of Alcohol, Tobacco, Firearms and Explosives for three years.  I am
currently assigned to the Detroit Field Office of DOL/OIG.  During my years at the
Department of Labor, I have conducted numerous investigations into criminal
violations of both Title 29 and Title 18 of the United States Code. During this time,
I have been either the lead agent or supporting agent on several investigations
involving criminal schemes targeting the State of Michigan's (SOM)
Unemployment Insurance Agency (UIA) through the filing of false or fictitious
unemployment insurance (UI) claims. Based on my direct personal experience with
these cases, I have become familiar with the methods that criminals use to attack
and exploit the UI systems as well as tools and methods criminals often utilize to
facilitate that fraud.

2.      I have graduated from the Criminal Investigator Training Program (CITP)
and the Inspector General Investigator Training Program (IGITP) at the Federal

Law Enforcement Training Center (FLETC).  I attended and participated in joint in-service sessions for DOL-OIG/OI-LRF agents and Federal Bureau of Investigation (FBI) agents, for training on the current criminal laws prohibiting labor racketeering and other criminal violations of Title 18 and Title 29 of the United States Code.  I have also received training in documentary and electronic evidence given by members of the Computer Crime & Intellectual Property Section (CCIPS) of the U.S. Department of Justice (DOJ).  Furthermore, I received training specific to insider threats and internal employee investigations in IGITP as employee integrity investigations commonly worked by IG agents.

3.      As a result of my participation in this investigation, I submit that there is probable cause to believe that **Mykia King** (DOB XX/XX/1993) has committed federal crimes, including but not necessarily limited to mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and conspiracy to commit those crimes (18 U.S.C. § 1349).  I make this affidavit based upon personal involvement in the subject criminal investigation, including review of law enforcement databases, financial documents, Internet Service Provider (ISP) records, and unemployment insurance claims data from SOM records detailing a UI fraud scheme perpetrated by **Mykia King** and State of Michigan Lead Claims Examiner Jermaine Rose.  On August 18, 2020, Rose was charged in a criminal complaint in the Eastern District of Michigan for wire fraud (18 U.S.C. § 1343), mail fraud (18 U.S.C. § 1341),

conspiracy to commit those acts (18 U.S.C. § 1349), and theft of government funds (18 U.S.C. § 666) (Case No. 20-mj-30303).

4.      I have also been provided with information from other law enforcement agents and officials from the United States Secret Service (USSS), and the State of Michigan's Fraud Investigation Unit (SOM-FIU).  Because this affidavit is submitted for the sole purpose of supporting a criminal complaint and arrest warrant, it does not necessarily contain all information and facts discovered and developed in the course of this investigation.

## Summary

5.      In early July 2020, my agency received allegations involving a fraud scheme aimed at defrauding the SOM and the U.S. Government of millions of dollars earmarked for Pandemic Unemployment Assistance (PUA).  In reviewing these allegations, investigating agents identified SOM UIA Lead Claims Examiner Jermaine Rose as a target of the investigation.  The investigation has shown that Jermaine Rose has used his position as a SOM employee to wrongfully release payment on multiple fraudulent UI claims filed against the SOM, including multiple claims filed by **Mykia King**.  Jermaine Rose was not assigned nor had any legitimate reason to access, let alone modify, the claims.  The actions of Rose and others involved in this investigation have resulted in an actual loss of

approximately over $923,000 to the State of Michigan.  Between July 3, 2020 and

July 30, 2020, when he was suspended by the agency, Jermaine Rose attempted to

override holds on approximately over $1,515,000 in additional fraudulent claims.[1]

These attempts were blocked due to daily monitoring by SOM.

## Unemployment Insurance – Background & COVID-19

6.      The Social Security Act of 1935 initiated the federal and state

unemployment insurance system.  The system provides benefits to individuals who

are unemployed for reasons beyond their control.  The purpose of the UI system is

twofold:  first, to lessen the effects of unemployment through cash payments made

directly to laid-off workers, and second, to ensure that life necessities are met on a

weekly basis while the worker seeks employment.  In the State of Michigan, the UI

system is administered by the Unemployment Insurance Agency, which is part of

the SOM's Department of Labor and Economic Opportunity (DLEO).  The U.S.

Department of Labor funds many UIA administrative costs, including salaries,

office expenses, and computer equipment.

---

[1] The criminal complaint charging Rose stated that Rose's actions have resulted in
an actual loss of $1,011,000 and that he was found to have attempted to override
holds on approximately $761,000 in additional fraudulent claims.  Since that time,
SOM conducted further analysis of the claims reviewed by Rose, and provided
Affiant with updated loss calculations.

7.      State unemployment systems and benefits are joint state and federal

enterprises largely financed by taxes on private employers located in that state.

When state unemployment benefits are exhausted, they may be supplemented by

federal funds appropriated by the U.S. Department of Labor. At the time of this

application, the federal government is providing significant supplemental benefits

to the states as a result of the COVID-19 pandemic.

8.      The Families First Coronavirus Response Act (FFCRA) became law on

March 18, 2020, and provided additional flexibility for state unemployment

insurance agencies and additional administrative funding to respond to the

COVID-19 pandemic. The Coronavirus Aid, Relief, and Economic Security

(CARES) Act was later signed into law on March 27, 2020, and the American

Rescue Plan Act of 2021 (ARPA) was later signed and further expanded states'

ability to provide unemployment insurance for many workers impacted by the

COVID-19 pandemic, including for workers who are not ordinarily eligible for

unemployment benefits.

The CARES act further expanded states' ability to provide unemployment

insurance for many workers impacted by the COVID-19 pandemic, including for

workers who are not ordinarily eligible for unemployment benefits.  One such

program established to accomplish that end was the Federal Pandemic

Unemployment Compensation (FPUC) program.

The FPUC allowed eligible individuals who were collecting certain UI benefits, including regular unemployment compensation, to receive an additional $600 in federal benefits per week for weeks of unemployment ending on or before July 31, 2020.

Another such program, the Pandemic Emergency Unemployment Compensation (PEUC) program, allowed those who exhausted benefits under regular unemployment compensation or other programs to receive up to 13 weeks of additional federally funded benefits up to December 26, 2020.

On December 27, 2020, the President signed legislation that extended these programs for an additional 12 weeks.  Those receiving unemployment benefits were entitled to an additional $300 each week of unemployment until April 4, 2021. At the time of this application, the legislation and programs detailed above have extended many of these federally backed benefits until early September 2021.

That is all to say, the recent federal legislation and programs detailed above allowed for a significant outlay of federal funds to flow to and through the states to offset the recent and historic need of the American workforce for unemployment benefits as a result of the COVID-19 pandemic, including the American workforce in the SOM and in the Eastern District of Michigan (EDMI). Collectively and

colloquially, the funds flowing from these programs have come to be known as Pandemic Unemployment Assistance (PUA).

9.      Normally (in the absence of fraud), an unemployed worker initiates an UI claim.  This can be accomplished by submitting a claim in person, over the telephone, or on the Internet.  Currently, the overwhelming majority of UI claims are filed online through the UIA's website.  In order to be eligible for UI benefits, the worker must demonstrate a certain level of earnings in several quarters immediately preceding the application.  The amount of unemployment benefits that a UI claimant might be eligible for depends on a variety of factors, including but not limited to the length of his or her previous employment and the amount of wages he or she earned.

10.    The SOM UIA will either approve or reject a UI claim based on the application made by the unemployed worker.  If the SOM UIA approves a UI claim, the claimant is required to re-certify the claim via telephone or Internet at various times during the life of the claim.  The worker must also certify that he or she is still unemployed and actively seeking work.  One way in which unemployment benefits are provided to a claimant is through the use of a debit card, issued by the Bank of America (BOA), which is mailed to the claimant through the U.S. Postal Service. The unemployment benefits are loaded onto the

debit card electronically, and additional benefits are loaded onto the card electronically every two weeks.

## Unemployment Insurance – Fraud Prevention

11.     In an effort to prevent and otherwise inhibit external fraud, SOM UIA captures certain external data surrounding the interaction between an individual and the UIA system.  This data is compiled in a system named the "Michigan Integrated Data Automated System" (MiDAS).  Each time a claim is accessed in MiDAS, it creates a digital footprint of sorts.  Some of the data that the SOM collects includes the dates, times, Internet Protocol (IP) address, and Media Access Control (MAC) address associated with the device accessing the claim. SOM ties this information to the user-entered information captured to facilitate the claim (i.e., name, address, social security number, BOA or other bank account numbers, bank routing numbers, etc.).  SOM's MiDAS system also utilizes certain proprietary algorithms that automatically identify and stop possible fraud based on whether or not a claim exhibits fraud indicators that exceed a designated threshold. Agents also note that humans who review claims and conclude that the payments may be involved in fraud can also take action to stop payment of the claims.

For the remainder of this affidavit, the investigating agent will refer to the process detailed above as a "fraud-stop."

12.     In an effort to prevent and otherwise inhibit internal fraud or insider threats,

SOM UIA captures certain internal data surrounding the interaction between SOM

employees, contractors, consultants and MiDAS.  That is to say that MiDAS

maintains an "audit trail," which details any insider who touches, alters, or

otherwise modifies a claim. SOM can attribute an insider's actions to a particular

individual, as those accessing the system are required to enter unique credentials.

SOM also maintains workflow logs for its employees that detail which claims are

assigned to a particular employee.  Additionally, SOM maintains call logs to

document telephonic contact between employees and claimants.  The workflow

logs and call logs detail whether insiders had a legitimate reason to access or

modify a claim.

13.     Investigators from SOM's Fraud Investigations Unit have the ability to

access and review the data maintained for both external and internal actors in

MiDAS.  It is through the analysis of this data that investigating agents can identify

fraudulent trends and tendencies associated with the unemployment insurance

claims.

### Claims Examiner Jermaine Rose

14.     The investigation has shown that Jermaine Rose was hired by the State of

Michigan on or about March 28, 2004 as an Unemployment Insurance Examiner.

15.    According to the Michigan Civil Service Commission Job Specification

listed on the State of Michigan's website, an Unemployment Insurance Examiner

(UIE) is responsible for reviewing and processing various UI claims using SOM

equipment and the SOM's MiDAS system. UIEs provide services to claimants,

employers, and the general public.

### Probable Cause

16.    In early July 2020, SOM-FIU alerted DOL-OIG about a suspected Pandemic

Unemployment Assistance (PUA) fraud scheme occurring involving a State of

Michigan employee who was then working from home at a residence located in the

Eastern District of Michigan.

17.    SOM-FIU had determined that approximately 34 UI claims were filed

electronically from the same IP address 24.127.138.244.  After review of the

claims, it was determined the same driver license photos and social security cards

were uploaded for multiple claims, even though the claimants seemed to have

different names and addresses.  It is common sense that over 30 different

individuals all utilizing the same IP address to file their UI claims is fraudulent on

its face because it is unlikely that so many individuals reside at a single address (let

alone are all eligible to file UI claims).  In addition, the fact that multiple claims

used the same pictures for their proof of identification—for example, one picture

was used with four different claims and another for three different claims—provides further indication of fraud.  28 of the claims filed by the IP address were stopped and Identity Verification (IDV) was requested.  Jermaine Rose improperly accessed, discarded Identity Verification issues, and released payments on 23 of the 28 fraud-stop claims; this resulted in a loss of over $366,000 to SOM.

18.    The SOM-FIU investigators reviewing Jermaine Rose's audit logs recognized the aforementioned activity as problematic and subsequently began a more extensive review of his MiDAS audit logs.  SOM-FIU made the determination that Rose's actions were fraudulent based on the fact that in the overwhelming majority, if not every case, Rose overrode a fraud-stop placed on the underlying claim.  Review by SOM-FIU indicates that Rose neglected to notate the files as to why the stops were discarded, which is standard procedure for a UIE.  Additionally, SOM-FIU's review of Rose's assigned work items failed to disclose any legitimate reason to access and/or modify the subject claims.

Finally, through the analysis of Rose's audit logs, SOM-FIU determined that Rose targeted specific claims generally associated with similar IP addresses and physical addresses.  That is to say, Rose appeared to be intentionally overriding specific fraud-stops and his actions were not a result of randomly approving unrelated claims.

19.    Agents determined that IP Address 24.127.138.244 was controlled by

Comcast and obtained the related records on July 23, 2020.   Analysis of the

records disclosed that the account was active and that the service and billing

address associated with the account was XXXX0 N Park Drive #XX5, Southfield,

MI 48075.  DTE utility records received on October 26, 2020 stated that **Mykia**

**King** was the account holder at the same address were the IP address was located.

## Mykia King's PUA Claims

20.    On May 16, 2020, a PUA claim for an individual identified herein as "K.F."

was electronically filed with the SOM.  A Michigan driver's license was uploaded

as proof of identification for the fraudulent claim on June 9, 2020.  The address

used for the claim was **Mykia King's** address, XXXX0 N. Park #XX5, Southfield,

MI 48075.  Due to the out-of-state Social Security Number, the system requested

an Identity Verification (IDV).  On June 11, 2020, Jermaine Rose accessed the

account and discarded the IDV.  K.F.'s PUA claim was processed for payment.

21.    On the same date, approximately 15 minutes earlier, Jermaine Rose

discarded an IDV request for a PUA claim for an individual identified herein as

"R.E."  R.E.'s PUA claim had the same driver's license photo as K.F.'s.  R.E.'s

claim also used the same street address as K.F.'s, but had a different apartment

number.

22.    Jermaine Rose viewed the claims—under different names but using the same documents—just 15 minutes apart, and discarded both fraud stops, resulting in a total loss of $21,800 to the State of Michigan.

23.    **<u>Mykia King</u>** uploaded her real Michigan identification card when applying for her own UI benefits.  The ID below was compared to the automated teller machine (ATM) photos provided by Bank of America, to confirm the identity of who was using the fraudulent UI debit cards.



24.   On June 27, 2020, **Mykia King** can be seen using the R.E. Bank of America

UI debit card.



25.    On the same day, Mykia King is seen using the K.F. Bank of America UI debit card at another ATM.



26.    On May 13 and May 16, 2020, PUA claims were filed for individuals identified herein as "T.W." and "P.S." respectively.  Both claims were filed using **Mykia King's** address. However, due to the SSNs belonging to out-of-state residents, the system requested an Identity Verification (IDV) for both claims. Fraudulent Michigan driver licenses bearing pictures of the same individual (with different names) were uploaded as proof of identification for the fraudulent claims.

On June 19, 2020, Jermaine Rose accessed the accounts, just eight minutes apart, and discarded the IDVs.  Both PUA claims were processed for payment, resulting in a loss to SOM of $21,480.

27.     On May 23, 2020, **Mykia King** can be seen using the T.W. Bank of America UI debit card.



The images contained in this transmission were generated for the internal use of Bank of America and are being shared with law enforcement solely for use by law enforcement.  Written consent must be obtained from Bank of America prior to sharing an image with a third party.  Bank of America makes no representation or warranty of any kind with respect to any photograph, film, videotape or digital image and specifically disclaims liability to any person or entity for all damages, losses, claims, or expenses (including attorney's fees) arising from the furnishing or subsequent use, distribution or publication of any photograph, film, videotape or digital image provided to law enforcement by Bank of America.  Any use or further distribution of this photograph, film, videotape or digital image by any party not employed directly by Bank of America is the sole responsibility of the user/distributor. Bank of America will only certify or attest to records or images provided under valid legal process.

28.    On June 27, 2020, **Mykia King** can be seen using the P.S. Bank of America

UI debit card, a minute after using the R.E. UI debit card at the same ATM.



29.    On June 5 and June 9, 2020, PUA claims were filed for individuals

identified herein as "T.R." and "M.B." respectively.  M.B.'s claim was filed using

**Mykia King's** address.  T.R.'s claim used the same street address, but had a

different apartment number.  However, due to the SSNs belonging to out-of-state

residents, the system requested an Identity Verification (IDV), for both claims.

Fraudulent Michigan driver licenses bearing pictures of the same individual (with

different names) were uploaded as proof of identification for the fraudulent claims.

30.     On June 10, 2020, Jermaine Rose accessed the M.B.'s claim and discarded the IDV.  Both the T.R. and M.B. PUA claims were processed for payment.  The loss to SOM was $20,120.

31.     On June 28, 2020, **Mykia King** can be seen using the T.R. Bank of America UI debit card.



32.     On July 7, 2020, **Mykia King** can be seen using the M.B. Bank of America

UI debit card.



33.     On September 8, 2020, Bank of America provided bank records for 17

Michigan Unemployment Insurance debit cards that were associated with claims

that appear to have been fraudulently filed by King, including statements and ATM

photos. The cards were used primarily to make ATM withdrawals from Bank of

America ATMs.  **Mykia King** was seen at the ATM making withdrawals with

every UI debit card. None of the cards used were issued to her.

34.     In my training and experience, it appears that **Mykia King** fraudulently filed

UI claims in order to obtain unemployment benefits she was not entitled to.  The IP

address associated with **Mykia King's** Southfield address was responsible for electronically filing the above-described PUA claims.  Many of those claims used the same photos, with different Personal Identifying Information (PII), as proof of identification.  Also, seven of the cards were mailed to XXXX0 N. Park #XX5 where **Mykia King** resides; several more used the same street address with different apartment numbers.  In my training and experience, I believe it is possible **Mykia King** would have the ability to gain possession of the cards mailed to her apartment complex using the different apartment numbers.  With the filing of these fraudulent claims, **Mykia King** attempted to defraud the State of Michigan out of approximately over $930,200, but actually obtained approximately $366,820.

### **Uses of Mail and Wires**

35.     After the Unemployment Insurance Agency accepts an unemployment claim, it transfers the initial unemployment benefits into an account associated with a bank, a prepaid debit card, or with an unemployment insurance debit card.

UI funds are sent via wire from Michigan and processed through the Bank of America (which handles all Michigan UI processing), specifically through Bank of America data center locations in the states of Virginia and Texas. In this case, after the funds were processed through Bank of America, **Mykia King** used the Bank of America debit cards to make cash withdrawals from ATMs throughout the Detroit

Metro area.  Therefore, the disbursement of these fraudulently obtained UI funds involved the use of interstate wires, which constitutes a violation of 18 U.S.C. § 1343 (and conspiracy to commit that offense in violation of 18 U.S.C. § 1349).

36.     In at least seven instances, an unemployment insurance debit card provided by Bank of America was mailed to **Mykia King's** address through the United States mail because it was the address provided for the fraudulent UI claim.  This debit card could be used to access the fraudulently obtained UI funds via ATMs or could be used at accepting retailers for point of purchase transactions.  Therefore, the mailing of these debit cards involved the use of the United States mail, which constitutes a violation of 18 U.S.C. § 1341 (and conspiracy to commit that offense in violation of 18 U.S.C. § 1349).

## Summary

37.     Based on my training and experience, the activity detailed above appears to be part of an UI fraud scheme perpetrated by **Mykia King** and Jermaine Rose, and may involve other co-conspirators currently unknown to law enforcement. The basis for my statement derives from the information below:

a.     During my career at DOL, I have worked several UI fraud cases involving multiple fraudsters and I am familiar with how criminals can manipulate the SOM's UI system to obtain fraudulent benefits.

b.      Within the last 30 days, I have had conversations with members of the law enforcement intelligence community concerning the rampant levels of PUA fraud occurring all over the country.  Those officials have discussed with me various scams and schemes they are tracking involving PUA including the possibility of insiders facilitating UI fraud schemes, including schemes similar to this.

Additionally, the FBI has advised that there are significant criminal resources and "guides" available through criminal networks on how to defraud various states, including SOM, of PUA benefits.  Many of these schemes involve coordinated efforts by a group of individuals who are communicating using electronic devices and social media.

c.      Based on Jermaine Rose's activity, it appears that the general scheme proceeds as follows.  Outside co-conspirators enter bad claims into MiDAS and provide the names/social security numbers associated with the claims to Jermaine Rose.  Jermaine Rose then discards any fraud-stops on the bad claims, facilitating the release of the fraudulently obtained payments.  Review of Jermaine Rose's cell phone seized during a search warrant shows he uses Facebook Messenger, calls and text messages to communicate during these fraud schemes with others.  This is bolstered by SOM-FIU analysis that Jermaine Rose's activity does not appear random, but rather targeted at specific claims.

## **Conclusion**

38.     Based on the forgoing, there is probable cause to believe that **Mykia King**

has committed federal crimes, including but not necessarily limited to mail fraud

(18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and conspiracy to commit those

acts (18 U.S.C. §, 1349), in connection with a scheme to defraud the federal/state

unemployment insurance program and obtain unemployment benefits by means of

false and fraudulent pretenses and representations.

Respectfully submitted,

Shanika Sanders
Special Agent
U.S. Department of Labor –
Office of Inspector General

Sworn to before me and signed in my
presence and/or by reliable electronic means.

ELIZABETH A. STAFFORD
UNITED STATES MAGISTRATE JUDGE